JOHN L. SMITH, appellant,

*v.*

ELI SMITH et al., respondents.

[Submitted November Term, 1916.　Decided March 5th, 1917.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Backes, who filed the following opinion:.

"This is a bill for the specific performance of a contract to convey land. The parties to the suit are brothers. On October 12th, 1905, they entered into an agreement whereby the defendant agreed to sell to the complainant his farm in Hunterdon county for $2,350, of which $500 was to be paid 'at any time within five years,' and 'the balance to be secured by a purchase-money mortgage. It was further stipulated

" 'that the said John L. Smith [complainant] shall occupy said farm from the date of this agreement and shall pay as rental for the same the interest on $2,350 from the 27th day of February, one thousand nine hundred and five, payable annually, and shall also pay all taxes and insurance up to the time the $500 shall be paid and deed given　*　*　*　and until such date keep the buildings and fences in good repair, the bushes cut along the fences, and farm the land in a good and husbandlike manner.'

"The right of re-entry was reserved upon a sixty-day default in the payment of the interest, taxes or insurance. The complainant entered into possession of the farm, and during the five years defaulted to the extent of $280 in the payment of rental and also within the time limited failed to make the payment of $500, and to execute the mortgage as agreed. He claims that performance was waived and the time extended indefinitely by the defendant, and in support testifies that before the time was up he told the defendant that he had arranged to borrow the $500 purchase price from one Fitzgibbon, and that he was ready to execute the bond and mortgage; that the defendant told him

there was no use doing that; that he did not need the money just then; that the complainant might as well pay him interest as to pay Fitzgibbon, and that he was willing to let the agreement run on. The defendant denies this, relating that he had given the complainant until the spring of 1911 to pay the $500, at which time the complainant came to him, in the presence of his wife and son, and stated that he had no money and could borrow none, and would have to give up the purchase of the farm, to which the defendant says he replied that if the complainant wanted to he could go on and stay and pay the interest the same as rental until he (the defendant) wanted to use the place. The wife gives substantially the same story, and the son, in all material respects, corroborates his parents, adding that his father told his uncle 'that if he could not get the money he could live on there, but the agreement expired, and under the same condition to pay that interest as rental.'

"I am inclined to believe that the complainant has forgotten and is mistaken in what occurred; that the defendant's version is correct and that the understanding of the two brothers was that the sales contract had come to an end, and that the complainant was to remain as a tenant upon the payment of $141 per annum, interest on $2,350, as rental. As matters stood, and as both parties then reflected upon the past and contemplated the future, the prospect of the complainant raising the $500 was hopeless. The defendant was kindly disposed towards his brother, and had evidently tried to help him along by letting him in on the farm on very easy terms. It may be inferred that both thought the complainant could save at least $100 a year in five years, so as to make the cash payment on or before the expiration of that time, but he was unsuccessful, and his finances were always in a precarious condition. When the five years were up, in addition to his default in the rental, the complainant was indebted to the defendant to the amount of $200 for money borrowed, and, besides, during all that time the defendant relieved him from the payment of the taxes on the farm, and to me it seems but natural that in these circumstances the complainant, in despair, gave up all hope and surrendered his right to purchase. I cannot believe that he offered, and that he was able to

pay, the $500, for his financial affairs were such as to make it unlikely that any person would lend him that sum without security, and he had none to give. The Mr. Fitzgibbon, from whom the complainant says he had arranged to borrow the money, is dead. What inducement was held out to him to lend the complainant the $500 is not disclosed, nor do I recall any testimony indicating that if he had agreed to lend the money that it was to be lent without security. Later circumstances also indicate pretty clearly that the tenure of the complainant was that of a tenant and not as the holder of an option under the agreement, and that he so understood. In January, 1915, he remarked to Percy L. Smith, another of defendant's sons, that he supposed he would have to get off the farm in the spring, and that the defendant would put him off—meaning, thereby, that a son of the defendant had then recently married and he would want the farm for his son. Later, in the same month, the defendant gave an option to a party to buy the farm and sent for the complainant and told him, so he testified, that he had a chance to sell, to which the complainant replied that it was the best thing that he could do, and that he, the complainant, had been ready to quit and get off the farm for the last two years, but did not want to use the defendant mean and leave the farm. And, further, that he told his brother he would give him $1,000 to vacate in the spring if the party holding the option took the place; that the brother seemed well pleased and thought he was doing a nice thing. He further said, so he testified, that he told the complainant if the party did not take the farm he could stay on for another year and pay rent, and then the defendant wanted the farm himself. This incident is also testified to by another son of the defendant. About the same time the complainant expressed himself to one Bigelow, a disinterested and reliable witness, as pleased with the sale and the anticipation of getting $1,000 from his brother.

"In arriving at my conclusion, I am asked by the counsel of the complainant to discredit the defendant's testimony and that of his wife and three sons, on the ground of their interest in the subject-matter. This I cannot do. Their interest is no greater than that of the complainant. They are quite as repu-

table, at least as far as appearances go, as the complainant is, and their testimony was given in a manner straightforward and convincing. The complainant's testimony stands alone, against the words of the defendant, his family and the witness Bigelow, and viewed in this aspect it is overwhelmed. But his counsel argues that there are undisputed circumstances in the case to which he refers, which overcome and overthrow all the defendant's evidence, and to a degree satisfactory to the mind, that his client alone related the exact truth. There is testimony that during the complainant's possession he made some improvements by clearing the farm of some rock, building fences, a hog house and a kitchen, putting shingles on the wagon house, foundation under two houses; building a concrete trough, removing dead trees, &c., all with the knowledge of the defendant. Just to what extent these improvements were made during the first five years, and those afterwards, was not made altogether clear by the testimony, but it does appear that the rock, and, as I recall it, the stone fences, which were replaced by barbed wire, were carried away and profitably sold by the complainant. The testimony does not satisfy me that what he did on the place was otherwise than consistent with his status as a possible owner during the first five years of his occupation and as tenant thereafter.

"Another matter referred to is the fact that there was endorsed on the contract of sale the receipts of the rentals as 'interest on the within contract.' This characterization of the moneys continued after the expiration of five years, and from this complainant's counsel argues that the reasonable inference is an acknowledgment by the defendant that the option agreement continued. This point suggested itself to my mind during the course of the trial, and I examined Mrs. Smith critically and at some length regarding it, and her explanation was that she ignorantly followed the form of the first endorsement, which was evidently written by someone else. Obviously, the word 'interest' in the receipts, even in the first form, was a misnomer, because it appears by the contract that the amount of interest on the purchase price was to be paid as a rental.

"The next thing to which my attention is called is that when

the defendant gave the option, he offered the complainant $1,-000 to vacate, if the sale were consummated, and it is urged that this was recognition of the complainant's ownership. But I cannot look upon it in that sense. The contemporaneous circumstances were these: One Del Fuga Giero was about to promote a manufacturing concern in the borough of Hampton, where this farm, or part of it, lies, and for that purpose took the option to purchase from the defendant at the price of $7,000. It was not contended upon the argument that that was a fair price for the place for farming purposes, and, indeed, it does not appear that it was worth very much more than the purchase price in the present contract. The inflation was entirely due to the supposed demand for the property and the option. And, as it impresses me, the defendant felt that he could well afford to be generous to his brother if the deal should be carried through, and he should facilitate its consummation by a ready surrender of possession. A handsome price was in prospect from the sale of this unprofitable farm, and it would have been good business policy to have made the offer, even if these brothers had been strangers, in order to remove a seeming obstacle to a quick sale. Aside from this, however, my notion is that the defendant was moved to make the offer in a spirit of fair play and justice towards his brother, who, by his labors, had in some degree, though slight, contributed to enhance the value of the farm; but his conduct ought not to be distorted so as to make it appear to have been an acknowledgment of the complainant's claim as optionee.

"The view I entertain makes it unnecessary to determine, and also wholly immaterial whether the agreement was one of sale with deferred execution, or a tenant's option to purchase, and whether time was of the essence of the contract. I have treated the case as one of facts, and the facts I find in favor of the defendant. The bill will be dismissed, with costs."

*Mr. Herbert Clark Gilson,* for the appellant.

*Mr. Harry L. Stout,* for the respondents.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Backes.

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, WHITE, HEPPENHEIMER, WILLIAMS, GARDNER—13.

*For reversal*—None.